Laramoke, Judge,
concurring:
As initially noted in the Per Curiam portion, this case comes before the court after the parties thereto filed a joint motion for judgment requesting that the court adopt the trial commissioner’s findings of fact, opinion and recommended conclusion. It is a puzzle to me why the defendant does not pursue the reorganization argument under 26 U.S.C. § 368(a) (1) (D) (1970) as developed by the James Armour, Inc. case, 43 T.C. 295 (1964), but having not done so, I reluctantly concur with the result arrived at by our commissioner.
FINDINGS of Fact
1. (a) These actions are to recover income taxes and interest paid by the plaintiffs to the defendant. These actions were brought within the time prescribed in Section 6532 of the Internal Revenue Code of 1954. The plaintiffs are the proper parties to bring these actions.
(b) If the court determines that the plaintiffs are entitled to recover, the amounts of the recoveries will be determined in accordance with Rule 131(c).
(c) This court has jurisdiction over these actions.
2. The plaintiffs were stockholders in Namco International, Inc. (“Namco”). Namco was incorporated in the Republic of Liberia on September 13, 1957. Its initial oapitali- *706 zation was $50,000 paid-in capital and surplus for 2,000 of its shares. The initial funds were provided equally by National Geophysical Company, Inc. (“National”), and by Continental Geophysical Company, for which they received stock subscriptions. The stock subscriptions were transferred to the plaintiffs for $50,000 on January 13, 1958.
3. Additional original operating funds were provided Namco by the Republic National Bank of Dallas, Dallas, Texas (“Republic”), and subsequently by Barclays Bank, D.C.O., London (“Barclays”). Republic gave Namco a loan commitment of up to $400,000 to finance its operations, and a further loan commitment was given by Barclays for 30,000 English pounds, equivalent to approximately $84,000.
4. At all times here relevant, the plaintiff John A. Gillin (“Mr. Gillin”) owned 974 shares (or 48.7 percent), the plaintiff Audrey G. Reed (“Mrs. Reed”) owned 542 shares (or 27.1 percent), the plaintiff Alexander E. McKay (“Mr. McKay”) owned 295 shares (or 14.8 percent), and the plaintiff Walter R. Mitchell (“Mr. Mitchell”) owned 187 shares (or 9.3 percent) of the stock of Namco; but on the date when Namco was dissolved, December 18,1962, Messrs. Gillin and McKay each owned one additional share, such shares having previously been registered in the names of E. Y. McCollum and Craig Ferris.
5. (a) Namco’s charter authorized not less than four and not more than seven members on its board of directors.
(b) During the entire period of Namco’s existence, from 1957 to December 18,1962, its board of directors consisted of four members, Mr. Gillin, Mr. McKay, Mr. Mitchell, and Joe L. Vaughan (“Mr. Vaughan”). These persons were also to serve later as the trustees in dissolution of Namco, by operation of law.
6. Namco was incorporated to engage generally in geophysical exploration work. The purpose of this work is to locate oil, and the method used was by the seismograph method. This method consists of generating a sound wave in the earth, which goes down to the sub-strata and is reflected back to the surface and recorded. The time interval is measured very accurately, and with that means the depth to the sub-strata can be determined.
*707 7. (a) Namco was domiciled in Monrovia, Liberia, and authorized the International Trust Company of Liberia to act as its resident business agent. Its United States office was first located in 8800 Lemmon Avenue, Dallas, Texas, and subsequently was moved to 2345 Mockingbird Lane, Dallas, Texas.
(b) Namco’s bylaws provided (among other things) that it might have offices in places other than Monrovia, as the board of directors might from time to time appoint or the business of the corporation might require.
8. During its corporate existence, Namco was engaged in the business of conducting geophysical surveys on a contract basis for the location of petroleum and other minerals in Libya, except that Namco performed such a survey in Guatemala during the period January 1958-September 1959. These surveys were conducted pursuant to written contracts with third persons, which contracts specified the duties of Namco as an independent contractor, the equipment and personnel to be provided by Namco, and the fees to be received by Namco for the services rendered.
9. In order to qualify to do business in Libya, Namco was required to register and obtain a working permit. Initially, Namco experienced difficulty in obtaining such permit, but on June 28, 1959, Libya authorized Namco to open a branch in Tripoli for a period of 5 years from June 28,1959.
10. During its existence, Namco was employed by three separate companies under five different contracts to search for subsurface geological structures favorable to the accumulation of oil and gas. Those companies, along with the dates, the locations of the work, and the field parties which performed the contracts, were as follows:
(a) American Overseas Petroleum, Ltd. (“American Overseas”), contract dated December 1, 1957, work performed from January 10, 1958, to December 16, 1962, in Libya, by Field Party No. 75; and contract dated July 22,1958, work performed from September 8, 1958, to December 31, 1961, in Libya, by Field Party No. 78.
(b) Guatemalan Atlantic Corp., contract dated November 23, 1957, work performed from January 15, 1958, to about October 1958, in Guatemala by Field Party Nó. 76; and *708 contract dated November 28, 1958, work performed from about January 1959 to September 1959, in Guatemala, by Field Party No. 76.
(c)B. P. Trading, Ltd., contract dated February 29,1960, work performed from about January 1, 1960, to about December 23,1960, in Libya, by Field Party No. 80.
11. For the performance of its contracts, Namco received the following gross fees: from American Overseas, $5,791,-148.16; from Guatemalan Atlantic Corp., $887,326.79; and from B. P. Trading, Ltd., $748,919.31.
12. (a) The geophysical surveys were performed by groups of men which were called “field parties.” The principal high-technology and generally supervisory personnel assigned to perform geophysical surveys are the party chiefs, supervisors, computers (seismologists), observers, surveyors, and drillers (tool pushers). The remaining employees, while essential to the operation of the party, could generally be more easily hired, and they performed less technical functions. These persons were shooters (handling of explosives), mechanics, welders, drivers, and helpers in the various functions, as well as persons associated with the logistics, such as cooks and maintenance personnel at the camp.
(b) During a representative pay period which included June 30,1960, Namco had on its payroll a total of 61 Libyan nationals and 20 nationals of countries other than Libya on Field Party No. 75 in the performance of the contract for American Overseas.
(c) During a representative pay period, which included June 30,1960, Namco had on its payroll a total of 56 Libyan nationals and 20 nationals of countries other than Libya on Field Party No. 78 in the performance of the contract for American Overseas.
(d) During a representative pay period, which included June 30,1960, Namco had on its payroll a total of 48 Libyan nationals and 16 nationals of countries other than Libya on Field Party No. 80 in the performance of the contract for B. P. Trading, Ltd.
(e) From its incorporation to its dissolution on December 18, 1962, Namco had hundreds of different employees, a *709 check on June 30, 1960, showing that 230 persons were employed on that date.
13. (a) The equipment needed to operate a full geophysical exploration crew depends in part on the geography of the area in which the work is to be performed. In general, crews must have seismic equipment, which includes seismometers, recording instruments, amplifiers, cameras, rotary drills, drilling bits, explosive storage facilities, trucks and other vehicles, eating and sleeping facilities (in remote areas), radio communications equipment, office equipment, and numerous other less expensive items. In Libya, such additional items as mine detectors were necessary. Both the physical equipment and the competence of the personnel of the field party are important and critical to the success of the party.
(b) During its years of operation, Namco purchased equipment for use in Libya, and such equipment was capitalized in the accounts in the amount of $1,232,102.91. Also, it is believed that Namco spent more than the amount mentioned for equipment items which were expensed, such as drill bits, drill parts, various other equipment parts, vehicle parts, etc., which would total about $2,500,000.
(c) Both the equipment and the high-technology and supervisory personnel of a field party are important and critical to the success of the party, along with the large amount of cash (or ample credit) necessary to finance the operation.
14. On December 31, I960, Namco entered into an agreement with Delhi Australian Petroleum, Ltd. (“Delhi”), to perform certain seismograph surveys in the Great Artesian Basin of Australia. This contract obligated Namco to perform seismograph surveys for Delhi in Queensland and South Australia, Australia, commencing on or about March 1, 1961. After signing the contract, Namco shipped certain equipment from its operations in Libya to Australia and attempted to qualify to do business in Australia. However, Namco could not qualify in either Queensland or South Australia because its name conflicted with other registered companies in the two states. Notification of failure to qualify was received on or about February 17,1961.
*710 15. When it was learned that Namco could not qualify to do business in Australia because of its name, Messrs. Gillin, McKay, Vaughan, and Mitchell had several conversations about it. Consideration was given to changing the name of Namco, but they felt that they could not get it changed in Libya. Furthermore, Namco had spent considerable amounts of money trying to get its name known among its clients, the oil companies, and it was felt it would be a big loss to change the name, even if it could be done. There was no thought at the time that Namco’s operations in Libya would be eventually terminated.
16. Because of Namco’s failure to qualify in Australia, Namco’s shareholders formed National McCollum Continental International, Inc. (“McCollum”). McCollum was formed solely for good business reasons. Namco then assigned the Delhi contract, with Delhi’s consent, to McCollum.
17. (a) McCollum was incorporated in the Republic of Liberia on March 2, 1961, for the purpose of engaging generally in geophysical exploration.
(b) McCollum was domiciled in Monrovia, Liberia, and its resident business agent was the International Trust Company of Liberia, which was also located in Monrovia. Mc-Collum’s bylaws provided, aanong other things, that it might have offices in places other than Monrovia, Liberia, as the board of directors might from time to time appoint or the business of the corporation might require.
(c) McCollum’s United States office, like Namco’s, was located at 2345 Mockingbird Lane, Dallas, Texas.
18. (a) McCollum’s initial capitalization was $1,000 paid-in capital for 1,000 shares of its common stock. The initial capital was provided by Mr. Gillin in the amount of $488, for which he received 487 shares of stock (or 48.7 percent), by Mrs. Reed in the amount of $271, for which she received 271 shares of stock (or 27.1 percent), by Mr. McKay in the amount of $148, for which lie received 147 shares of stock (or 14.7 percent), and by Mr. Mitchell in the amount of $93, for which he received 93 shares of stock (or 9.3 percent). E. V. McCollum and Craig Ferris, both of whom were residents of Tulsa, Oklahoma, held one share of stock each. Messrs. Gillin, McKay, and Mitchell and Mrs. Reed had the *711 same percentages of ownership in McCollum as each owned in Namco.
(b) Through June 30, 1963, additional operating funds were provided McCollum by loans from Republic in the amount of $380,000.
19. Although McCollum had only $1,000 in paid-in capital, it had a large borrowing capacity with Republic. Republic was quite willing to finance McCollum’s activities 'because the success of Namco had proved to Republic that McCollum’s management was very capable and could successfully operate a foreign corporation engaged in seismic or geophysical surveys. In fact, McCollum was able to secure this substantial line of credit on the basis of its officers’ endorsing the notes given for the loans. No personal notes were required as collateral. This line of credit was obtained at the time of the formation of McCollum in March of 1961, which was long prior to the dissolution of Namco in December of 1962.
20. (a) McCollum’s charter authorized not less than four and not more than seven members on its board of directors.
(b) During the period here in question, McCollum’s board consisted of four members, Messrs. Gillin, McKay, Mitchell, and Vaughan. These board members were also officers of Namco and McCollum during the period in question.
(c) Mr. Gillin served as president, Messrs. McKay and Mitchell were vice-presidents, and Mr. Vaughan was secretary-treasurer. Craig Ferris, J. H. Frasher, and E. V. McCollum were all vice-presidents of Namco and McCollum during all of this period. The remaining officers of Namco were E. L. Campbell, a vice-president, H. G. McCleary, a vice-president, and Fouad I. Moraif, assistant secretary. The remaining officers of McCollum were W. J. Harkey, a vice-president, Mrs. Reed, an assistant secretary, and Byron W. Dickie, an assistant secretary.
21. McCollum’s field parties, like Namco’s, consisted of high-technology, supervisory, and other personnel (see finding 12(a)).
22. (a) McCollum assigned its Field Party No. 81 to X)erforms its obligations under the agreement with Delhi (see *712 findings 14 and 16). Field Party No. 81 was employed on this contract from March 1, 1961, to 'about December 2, 1961. There were 25 employees originally assigned to Party 81.
(b) Fifteen of the 25 employees mentioned in paragraph (a) of this finding performed the less technical frictions and were classified as shooters (handling and detonating explosives), mechanics, assistant observers, drill helpers, etc. All of these 15 employees were employed in Australia for Party 81, with no previous employment with Namco.
(c) The remaining 10 of the 25 employees were regarded as high-technology personnel. They are described in the following subparagraphs of this paragraph (c) :
(1) Four were employed in Australia. They were Computer (seismologist) L. R. Burton, Observer H. E. W. Rose, Surveyor R. N. Whates, and Driller (tool pusher) W. G. Pfau. None had previous employment with Namco.
(2) Two were transferred to Australia from Namco in Libya when it was contemplated that Namco would perform under the Delhi contract. These two were Surveyor Bryan Humphrey, an Englishman, and Computer (seismologist) D. G. Mould, a Canadian. Both were transferred at their request.
(8) The remaining four high-technology employees were hired in Dallas for Party 81. Observer W. T. Bryant was hired on February 26, 1961, and terminated on April 28, 1961. He had been in the employ of Namco for the period from August 28, 1960, to November 9, 1960. A. C. Kitzman, Jr., was employed as Party Chief, and Billy Allen was employed as Driller (tool pusher). Neither had previous employment with Namco. On January 16, 1961, W. J. Harkey was employed by Namco (when it was contemplated that Namco would perform under the Delhi contract) and was sent to Australia to supervise what was to be Namco’s Field Party 81. However, due to the failure of Namco to qualify in Australia, Mr. Harkey and the personnel hired by him were terminated by Namco and hired by McCollum in their same capacities.
(d) W. J. Harkey’s authority as resident manager for McCollum was approximately the same as it would have been as resident manager for Namco if Namco had been able to qualify in Australia. As resident manager, he was in charge of the day-to-day operations, having the authority to employ *713 and terminate employees, to sign and endorse checks or other negotiable notes, to purchase and sell equipment, to negotiate with agents of the local government, to settle and pay claims, and to purchase personal property on behalf of the corporation on his signature alone. Mr. Harkey had been a resident manager for Namco in Libya from 1958 to June 15, 1960. From September 10, 1960, to January 15, 1961, he was employed by National for selling the services of National’s domestic parties and supervising the operations of such parties.
(e) In summary, Party 81 commenced with 25 employees, 19 of these employees having been employed in Australia, four having been employed in Dallas, and two having been transferred from Libya before it was known that Party 81 could not be a Namco party.
23. For the performance of the Delhi contract by McCol-lum’s Party No. 81, McCollum made certain purchases to equip the crew. It purchased for a total cost of $113,808.75 the equipment which Namco had transported from Libya to Australia when it was thought that Namco would qualify in Australia. The purchase price was determined by appraisals made by the parties to the agreement; it represented the book value (depreciated cost) for this equipment on Namco’s books; and it also represented fair market value. McCollum also purchased additional equipment from other sellers at a cost of at least $94,000 for use in the performance of the Delhi contract, excluding those items of equipment purchased for Party 81 which were charged to and reimbursed by Delhi.
24. (a) On May 2,1962, at a meeting of McCollum’s board of directors, Mr. Gillin said that it would be more economical for the Australian and Libyan operations to be carried on by a single corporation. It was further stated by Mr. Gil-lin that if McCollum were to qualify in Libya, it might take over Namco’s operations as well as undertake any new business which might be obtained in Libya. The board resolved that McCollum should qualify to do business in Libya. However, this resolution was never implemented, and McCollum never qualified in Libya and performed no *714 operations there except for a short time after Namco’s dissolution (see finding 48).
(b)Namco, in Libya, and McCollum, in Australia, operated concurrently from March 2,1961, McCollum’s date of incorporation, to December 18,1962, the date of Namco’s dissolution. Namco never performed any contracts in Australia, and McCollum never performed any contracts in Libya, except for two small temporary jobs requiring only three employees (see finding 48). Namco never qualified to do business in Australia, and McCollum never qualified to do business in Libya.
25. (a) McCollum actively conducted its business in Australia. In addition to the Delhi contract, McCollum entered into five separate contracts during 1962 and six separate contracts during 1963 to provide geophysical surveys in Australia. A list of these written contracts, in relation to the field parties assigned to perform the various contracts, is set out in the succeeding paragraphs of this finding.
(b) McCollum Field Party No. 81 performed the following contracts, all in Australia: with Delhi from March 1, 1961, to about December 2, 1961; with Planet Exploration Co. Pty., Ltd., from January 22,1962, to about November 19, 1962; with Alliance Oil Development Australia N. L., from May 26, 1963, to December 20, 1963.
(c) McCoEum Field Party No. 84 performed the following contracts, all in Australia: with Exoil Pty., Ltd., from May 18, 1962, to about August 30, 1962; with Exoil Pty., Ltd., from about September 21, 1962, to about November 8, 1962; with B.O.C. of Australia, Ltd., from November 14, 1962, to December 5, 1962; with Flamingo Petroleum Pty., Ltd., from February 24, 1963, to about April 23, 1963; with Exoil Pty. (N.T.), Ltd., from April 22,1963, to about April 30, 1963; with Mines Administration Pty., Ltd., from about June 1, 1963, to about July 31, 1963; and with Ampol Exploration (Queensland) Pty., Ltd., from about November 1, 1963, to about December 7, 1963.
(d) McCollum Field Party No. 85 performed the following contracts, all in Australia: with American Overseas from July 14,1962, to December 19,1962; and with Marathon Pe *715 troleum Australia, Ltd., from March 24, 1963, to August 24, 1963.
26. (a) Each of McCollum’s field parties employed a number of persons in the performance of its contracts.
(b) McCollum’s Field Party No. 81 had the following numbers of employees on its payroll in the performance of McCollum contracts in Australia at the following representative pay periods: June 30, 1961, 20 Australian nationals and five nationals of countries other than Australia; and September 30, 1963, 24 Australian nationals and four nationals of countries other than Australia.
(c) McCollum’s Field Party No. 84 had the following numbers of employees on its payroll hi the performance of McCollum’s contracts in Australia at the following representative pay periods: June 30,1962,19 Australian nationals and sis nationals of countries other than Australia; September 30, 1962, 19 Australian nationals and five nationals of countries other than Australia; November 30, 1962, 15 Australian nationals and six nationals of countries other than Australia; March 31,1963, 18 Australian nationalls and four nationals of countries other than Australia; April 30, 1963, 18 Australian nationals and four nationals of countries other than Australia; June 30, 1963, 17 Australian nationals and four nationals of countries other than Australia; and November 15, 1963, 14 Australian nationals and five nationals of countries other than Australia.
(d) McCollum’s Field Party No. 85 had the following numbers of employees on its payroll in the performance of McCollum’s contracts in Australia at the following representative pay periods: September 30,1962,12 Australian nationals and four nationals of countries other than Australia; and June 30, 1963, 20 Australian nationals and three nationals of countries other than Australia.
(e) During the period from incorporation to December 31,1963, McCollum had at least 212 different employees.
27. (a) During 1962 and 196,3, McCollum entered into contracts previously listed, which were performed by Field Parties Nos. 81, 84, and 85. By June 30,1963, McCollum purchased equipment and inventory, which were used by such field parties in the performance of such contracts, in addi *716 tion to the purchases referred to for the Delhi contract, which cost at least $284,000, excluding those items of equipment purchased for Parties 81, 84, and 85 which were charged to and reimbursed by its clients. Of this amount, $55,554.56 represented the cost of equipment and inventory previously owned by Namco in Libya and purchased by McCollum from Namco on May 4, 1962. The purchase price was at fair market value.
(b) McCollum purchased equipment for its Australian operations from the date of its organization (March 1961) through its fiscal year ended June 30,1963, in an amount of at least $492,000, excluding purchases of equipment which were charged to and reimbursed by clients, of which amount approximately 34 percent, or about $169,000, was acquired from Namco and approximately 66 percent, or about $323,-000, was acquired from others. There was a large amount of equipment purchased by McCollum from other sellers which was charged to and reimbursed by its clients and which is not included in these figures. These purchases from Namco were prior to the existence of any plan to terminate and liquidate Namco.
28. By means of a letter dated November 16,1962, Namco was notified by American Overseas that Namco’s last existing contract was being terminated on or about December 17, 1962. Termination of this contract was a disappointment to Namco; and if the contract had not been terminated, Namco would have continued to operate.
29. (a) After the receipt of the termination notice mentioned in finding 28, Namco’s board of directors met on November 28, 1962, and resolved, since extensive efforts had been unsuccessful in securing new business, and since the termination would have the effect of terminating the business of the company, to liquidate the Company.
(b) A special meeting of the shareholders was held on December 4, 1962, at which time the directors and officers were instructed to devise and carry out a plan of liquidation of the corporation.
(c) A plan of dissolution and liquidation was drawn up; and on December 11, 1962, the board resolved that the corporation terminate its business as of the date of termination of *717 its last contract, on or about December 17, 1962, and that the trustees in dissolution convert all the remaining property to cash and distribute the cash to the shareholders.
30. Prior to the receipt of the letter dated November 16, 1962, from American Overseas, Namco’s directors and shareholders had not given consideration to dissolving and liquidating Namco. During the summer and fall of 1962, Namco attempted to secure new business in Libya and Iran, but was unsuccessful. If it had, in fact, received new business in that area of the world, Namco would have remained in operation.
31. As of December 17, 1962, the day before Namco’s dissolution, Namco’s assets consisted of cash, accounts receivable, prepaid insurance, and inventory and fixed assets. The cash and accounts receivable totaled $499,139.10, the prepaid insurance $1,826.30, and the inventory and fixed assets $82,568.52. The liabilities were current liabilities in the amount of $50,280.74.
32. (a) The physical assets of Namco were all sold to McCollum on December 17, 1962, for cash. The price paid by McCollum for all of Namco’s physical assets, consisting of inventory, shop equipment, portable equipment, office furniture, office supplies, trucks and trailers, and camp equipment, was $82,568.52, which was their depreciated book value and their appraised fair market value.
(b) McCollum did not intend to use the equipment purchased from Namco on December 17, 1962, but intended to sell it as promptly as possible, which McCollum did (except as indicated in paragraphs (c) and (d) of this finding). Namco knew that McCollum was buying this equipment for resale.
(c) None of these physical assets purchased from Namco on December 17,1962, was used by McCollum in its Australian operations, except that certain spare truck parts, which McCollum could not otherwise dispose of and which originally cost $15,267.39, were finally shipped to Australia in November 1963 and January 1964. These parts were all obsolete and shopworn, and it is not known how many, if any, were actually used by McCollum in its operations.
(d) McCollum used for less than a month, in Libya but not in Australia, two trucks with drills which it purchased *718 from Namco. These drill trucks were utilized on a job which generated gross fees of about $3,500, as set forth subsequently in finding 48 (b).
33. Namco sold these properties on December 17, 1962, to McCollum for several reasons. Namco desired to dissolve as soon as possible after its business terminated and there was no prospect of any future business, and selling its properties to McCollum was expeditious and aided in accomplishing this purpose. Also, Namco was very concerned about the actions of the Libyans if the equipment were left idle in Namco’s name for any great length of time. The Libyans acted quite arbitrarily at times, and Namco had always had some trouble operating there with the Libyans, but this intensified somewhat, particularly with respect to income tax matters, although Namco had paid Libyan income taxes as due, as stated subsequently in finding 44. It was felt that there was a substantial risk that the Libyans might levy a duty on this equipment and possibly confiscate the equipment, and also possibly forfeit a bond of $84,000 that Namco had made at Barclays Bank in Tripoli. Namco felt that the dangers of arbitrary action or confiscation of the assets would be much less likely if title were not in Namco’s name and if another company were making the ultimate disposition of these assets. By selling the physical assets to one purchaser, which enabled the immediate dissolution of Namco, it was felt that Namco’s position was protected as much as possible. Namco would have been willing to sell the equipment to some company other than McCollum if it could have found another purchaser; but at the time when Namco sold its assets to McCollum, there were no other parties then willing to purchase the assets from Namco. Either way would have accomplished Namco’s purpose of converting its assets to cash and dissolving as soon as possible after its operations ceased.
34. It was not until about the end of 1962 that it was first realized that Namco’s operations would be terminated. Until that time, extensive sales efforts were made in an attempt to obtain new business in Libya. Prior to the notice of termination of the Field Party Number 75 contract with American Overseas by the letter dated November 16, 1962, there had *719 been, no discussions or thoughts of liquidating Namco and terminating its Libyan operations. In fact, in the fall of 1962, Namco was anticipating selling another crew and obtaining additional work although this did not occur.
35. Until the final decision to liquidate Namco at its board meeting on November 28, 1962, Namco performed as if 'it were to continue indefinitely. By way of illustration, Namco insured its vehicles effective September 1, 1962, for a 1-year period to August 31,1963; it purchased in Dallas and shipped to Tripoli a Eoto Lite Printer in August 1962; it contemplated expensive equipment replacements for the equipment on its Party 75; it attempted to secure personnel until late 1962 by many means, including advertising in August 1962 in various newspapers in Houston, Fort Worth, and Denver, and institutional ads in the A.A.P.G. bulletins in July 1962 and November 1962, the institutional ads costing $748.80; it was incurring travel expense to send its employees to Libya as late as October and November of 1962; its prospective employees were having physical examinations prior to being sent to Libya as late as November 1962; and it purchased large supplies of payroll forms in September 1962, which would last for a long period after December 1962. Namco’s officers expended substantial amounts of time and money in attempting to obtain business for Namco, both with old and prospective clients, until the final decision to liquidate the company. For example, Mr. McKay spent almost the entire month of October 1962 in New York City, Eome, Teheran, The Hague, and London calling on clients and prospective clients of Namco in attempts to obtain new business for Namco.
36. Namco was discontinued as a business entity on December 17,1962, and it did not perform any further business after that date.
37. Namco was dissolved solely for basic business reasons. Its business for the preceding 2 years was terminated on December 17, 1962; it had been unable to secure additional business despite extensive sales efforts; and there was no prospect of securing any additional business.
38. Namco received its Certificate of Dissolution, dated December 18, 1962, from the Secretary of State of the Ee- *720 public of Liberia. All of Namco’s outstanding stock certificates were returned to Namco’s secretary, were marked “Cancelled,” and were reinserted in the stock certificate book at the appropriate time.
39. All Namco stock owned by the Namco shareholders had been held for more than 6 months. Namco distributed all of its assets to its shareholders in consideration for the cancellation of their stock in Namco (see finding 46(a)).
40. In connection with the liquidation of Namco, no McCollum stock was issued to either Namco or its shareholders.
41. No ruling under Section 367 of the Internal Revenue Code of 1954 was sought or obtained by Namco or its shareholders in connection with Namco’s liquidation, and there was no discussion about obtaining such a ruling.
42. (a) For the 2 years prior to liquidation, Namco’s business had been the performance of geophysical services in Libya for American Overseas, its only customer at the time. For this work, Namco received gross fees of $915,182.70 for its fiscal year ending August 31, 1962, and made a profit of $98,332.68. For the 4 months of operations in the fiscal year 1963, September to December 17, 1962, gross income was $242,257.13, approximately $65,000 per month, and net income was $29,974.37. Namco’s business terminated with the termination of the American Overseas contract.
43. Namoo’s net income, after provision for income taxes, was as follows for its several fiscal years:
August 31, 1958. $11,499. 78
August 31, 1959. 339, 083.91
August 31, 1960. 33,353. 57
August 31, 1961. (71,323. 27)
August 31, 1962. 98,332. 68
August 31, 1963. 29,974.37
44.Namco paid its taxes in Libya in accordance with Libyan tax procedures. Namco’s chartered accountants in Libya, Nawar and Company, furnished Namco’s financial statements to Libyan officials for each tax period, and the procedure was that the accountants and tax officials mutually agreed on the amounts due. Namco paid taxes to Libya for the periods through August 31, 1960, totaling $52,203.21. Subsequently, after 1962, certain of Namoo’s records, includ *721 ing records of taxes paid, were confiscated by the Libyan tax officials from the office of Namco’s chartered accountants, Nawar and Company, in Libya, and it is not possible to determine the exact amount of taxes paid for the periods ending after August 31, 1960. However, it is believed that Namco had taxable income totaling approximately $64,000 for the periods after August 31, 1960, against which tax rates of from 10 to 13 percent applied.
45. The earned surplus of Namco, out of which distributions were made to shareholders, was $452,710.82, which amount constituted earnings and profits within the meaning of the Internal Revenue Code of 1954.
46. (a) Messrs. Gillin, Mitchell, McKay, and Vaughan were the trustees of Namco in dissolution by operation of law. The remaining property, other than cash, was sold for cash, and distributions in the sum of $195,000 to Mr. Gillin, $108,-400 to Mrs. Reed, $59,200 to Mr. McKay, and $37,400 to Mr. Mitchell were paid on December 26, 1962. The second distribution was made on March 12, 1963, when the sums of $43,-875, $24,390, $13,320, and $8,415 were paid to Mr. Gillin, Mrs. Reed, Mr. McKay, and Mr. Mitchell, respectively. Finally, in 1965, the last distribution of $12,710.82 was made to the taxpayers. The total amounts received by them were as follows: Mr. Gillin, $245,071.53; Mrs. Reed, $136,234.63; Mr. Mitchell, $47,003.46; Mr. McKay, $74,401.20; total, $502,710.82.
(b) Messrs. Gillin, Mitchell, and McKay and Mrs. Reed all reported the amounts received, less their bases in Namco stock, as 'long-term capital gains; but to the extent that there were earnings and profits, the Internal Revenue Service treated the amounts received as dividends.
(c) Asa result of the ruling by the Internal Revenue Service mentioned in paragraph (b) of this finding, Mr. Mitchell and his wife were required to pay, and did pay, to the Internal Revenue Service assessed tax deficiencies and interest in the amount of $23,799.53 for the year 1963 on or before April 15, 1964, and in the amount of $18,638.18 for the year 1962 on or about March 12, 1968. Thereafter, Mr. Mitchell and his wife timely filed with the Internal Revenue Service a claim for refund in the amount of $18,638.18 for the year 1962, plus interest, and a protective claim for refund in the *722 amount of $321.59 for the year 1963, plus interest. Each of these claims was rejected by the Internal Revenue Service on or about June 27, 1968.
(d) Asa result of the ruling by the Internal Revenue Service mentioned in paragraph (b) of this finding, Mrs. Reed and her husband were required to pay, and did pay, to the Internal Revenue Service on or about March 13, 1968, assessed tax deficiencies and interest in the amount of $49,-598.84 for the year 1962 and in the amount of $3,880.75 for the year 1963. Thereafter, Mrs. Reed and her husband timely filed with the Internal Revenue Service claims for refund of the amounts previously mentioned, plus interest. Each of these claims for refund was rejected by the Internal Revenue Service on or about June 27,1968.
(e) As a result of the ruling by the Internal Revenue Service mentioned in paragraph (b) of this finding, Mr. Gillin was required to pay, and did pay, to the Internal Revenue Service in March 1968 assessed tax deficiencies and interest in the amount of $6,038.75 for the year 1961, $153,669.56 for the year 1962, $21,352.79 for the year 1-963, and $23,399.22 for the year 1964. Thereafter, Mr. Gi'llin filed with the Internal Revenue Service timely claims for refund of such amounts, plus interest (except that the claim for 1961 was in the amount of $6,211.20). Each of these claims for refund was rejected by the Internal Eevenue Service on or about June 27, 1968.
(f) As a result of the ruling by the Internal Revenue Service mentioned in paragraph (b) of this finding, Mr. McKay and his wife were required to pay, and did pay, to the Internal Revenue Service on or about March 12, 1968, assessed tax deficiencies and interest in the amount o'f $29,891.63 for the year 1962 and $2,954.30 for the year 1963. Thereafter, Mr. McKay and his wife timely filed with the Internal Reve-nue 'Service claims for refund of the amounts previously mentioned, plus interest. Each of these claims was rejected by the Internal Revenue Service on or about June 27, 1968.
47. (a) As events turned out, McCollum was able to sell to third parties, at a small profit, all of the assets which it had purchased from Namco on December 17, 1962, with the *723 exception of some of the spare truck parts. Also, McCollum did not have any unusual problems with the Libyans.
(b) In the sale of these properties, McCollum had a gross gain of $44,658.27 and a net gain of approximately $26,000. The difference in the gross and net gam is accounted for by McCollum’s salary costs of H. G. McCleary and Fouad Moraif in selling and disposing of the equipment, the need to keep an office and equipment storage area until disposition, and expenses resulting from difficulties with customs officials, including customs and export fees and travel expense, guard service, etc. McCollum employed two persons in Libya who had been employed by Namco at dissolution, H. G. McCleary and Fouad Moraif, solely to sell or otherwise dispose of the equipment which McCollum purchased from Namco. These two men terminated employment with McCollum about May 1962.
(c) McCollum never claimed depreciation on its books or for Australian tax purposes with respect to the equipment purchased from Namco in December 1962.
48. (a) After Namco had dissolved and was in liquidation, McCollum performed two small jobs in Libya for American Overseas pursuant to two new agreements, one commencing December 19,1962, and the other on January 7,1963.
(b) After Namco’s dissolution, McCollum was trying to sell the assets purchased from Namco, and McCollum inquired of American Overseas, among others, whether it desired to purchase some of this equipment. At that time, American Overseas requested McCollum to furnish a drill and drillers to drill for a small amount of velocity information in Libya. McCollum agreed to perform this work and signed a contract with American Overseas on December 19,1962, for this work. The equipment utilized (two 6x6 International trucks with Mayhew Model 1000 heavy duty, all purpose combination drills) had been purchased from Namco on December 17, 1962, and only one person, M. Cherniwchan, a driller, formerly employed by Namco, was hired by McCollum to complete this job. He performed this work from December 19, 1962, until January 11, 1963, or for less than a month, after which he left McCollum’s employ. Gross fees for this service were about $3,500.
*724 (c) On January 12,1963, McCollum was hired by American Overseas to provide interpretative services in Libya by two men for a period of not to exceed 6 months, commencing January 7, 1963. This work was performed pursuant to a contract between McCollum and American Overseas dated January 12, 1963. No equipment was used to perform this contract. Two men were available to perform this contract and did perform it, R. W. Coupland and E. J. Griffiths, both computers (seismologists) who had been in Namco’s employ up to December 17,1962, the date before Namco’s dissolution. Griffiths terminated his employment with McCollum in February 1963, and Coupland terminated in June 1963. Gross fees totaled approximately $10,000.
(d) The gross fees from these two small American Overseas services were about $13,500. There was no profit and probably a small loss. This McCollum work was performed in Libya as an accommodation to American Overseas, was unsolicited, was pursuant to new agreements between McCollum and American Overseas, and was for a short period. There was no substantial loss and no problems experienced. This was McCollum’s business and was not done on contracts originally given to Namco.
49. Other than the jobs described in finding 48, McCollum performed no services in Libya. McCollum did, however, employ two other persons in Libya who had been employed by Namco at dissolution, H. G. McCleary and Fouad Moraif, solely to sell or otherwise dispose of the equipment which McCollum purchased from Namco. These two men terminated their employment with McCollum in about May 1962. None of Namco’s other employees at the date of dissolution was employed by McCollum either in Libya or in Australia.
50. Just prior to liquidation, Namco had on its payroll for Party No. 75 61 Libyan nationals plus 20 high-technology employees, all working in the field. Namco also had one man assigned to its Libyan office. Of these 82 employees, only five were employed by McCollum for the previously mentioned temporary purposes in Libya and were terminated within 6 months after December 1962. None of Namco’s employees at liquidation went to Australia with McCollum.
*725 51. Any common officers of Namco and McCollum had been officers of McCollum since it began business almost 2 years prior to Namco’s dissolution and prior to any plan to liquidate and terminate Namco. Other than for certain sales efforts, the common officers spent very little time working for either Namco or McCollum. The revenue-producing work, and much of the sales efforts, were done by employees on location.
52. A strong cash position (whether the cash was obtained through capital contributions or through borrowing) was an important asset to Namco, as well as to McCollum. All of the equipment required for a field party was very expensive, and it cost some $300,000 to $400,000 to equip a field party. Prior to the dissolution of Namco, Namco was anticipating putting out another crew, and the equipment for that crew would have cost about $400,000. Also, the equipment that was being worked for American Overseas on Party No. 75 at liquidation was old and worn, and replacement of that equipment was considered necessary within a short time if American Overseas had not terminated the contract. This replacement would have required a large amount of cash. If a new contract had been obtained and the American Overseas contract had continued, Namco would have had to use all of its cash and also borrow additional funds to perform its operations. Also, a customary practice in the industry is that the oil company client does not pay for services rendered to it by the geophysical contractor, such as Namco, until a period of at least 1 to 2*4 months has expired after the services have been rendered. Cash was necessary for Namco to meet payroll and equipment costs, which could be very large, until the oil company client reimbursed or paid the geophysical contractor for these costs. Cash, personnel, and equipment are particularly important to geophysical operations.
53. McCollum in Australia and Namco in Libya had only one common client, American Overseas. American Overseas was by far Namco’s most important client, while American Overseas was only a minor client of McCollum in Australia. The work McCollum performed for American Overseas in Australia was under a contract dated August-17, 1962. The work was begun on July 14, 1962, and it was completed on *726 December 19, 1962. Fees from this contract were $107,130.23, which constituted only about 5 percent of McCollum’s fees of $1,956,347.92 through June 30,1965. The date of termination of American Overseas’ work with McCollum was the approximate date of American Overseas’ termination of Namco’s Libyan work and the dissolution of Namco. After December 1962, McCollum performed no work in Australia for any former Namco clients. The only McCollum work after Namco’s dissolution for a common client were the two small jobs which McCollum performed for a few months in early 1963 for American Overseas in Libya, as set forth in finding 48, utilizing three former Namco employees, but the gross revenues were only $13,500, and the net revenues probably zero or a small loss. The gross revenue was less than I percent of McCollum’s fees through June 1965 and much less than 1 percent of Namco’s total fees or of Namco’s fees from American Overseas.
54. McCollum operated three crews in Australia identified as Parties Nos. 81, 84, and 85. The employees originally assigned to Party 81 are described in finding 22. Twenty-five employees (including 10 high-technology) were originally assigned to Party 84, and 16 employees (including nine high-technology) were originally assigned to Party 85. Nineteen of the 25 employees originally assigned to Party 84 were hired in Australia and are believed to have been Australian;
II out of the 16 employees originally assigned to Party 85 were hired in Australia and are believed to have been Australian. Among all these employees, only Humphrey, an Englishman, and Mould, a Canadian, were transferred from Namco in Libya to McCollum in Australia, and they were transferred in early 1961 when it was thought that Party 81 would be a Namco crew.
55. McCollum’s net income for its fiscal years 1961, 1962, and 1963, after provision for income taxes, was as follows:
June 30, 1961--- ($18,289.17)
June 30, 1962_ 20, 470.86
June 30, 1963 — ..-_----_ (15, 405. 53)
56. McCollum filed timely tax returns with the Australian government and paid all taxes due. McCollum filed a return for the period ending June 30, 1961, showing a loss, and no *727 taxes were due. McCollum filed returns for the periods ending Juno 30, 1962, and June 30, 1963, and it paid taxes of $10,761.30.
57. (a) McCollum continued to engage in business in Australia after the period here in question until June 30, 1965, when it was sold.
(b) From the commencement of operations in March 1961, through its fiscal year which ended June 30,1963, McCollum had total fees of over $1 million. Through June 30, 1965, McCollum had earned fees of $1,956,347.92.
58. (a) National was incorporated in Delaware on July 25, 1944. Its principal office was located at 2345 Mockingbird Lane, Dallas, Texas, and it was owned by Messrs. Gillin and Mitchell and Mrs. Reed. Mr. McKay had no interest in National.
(b) Before 1959, National was in the business of conducting geophysical surveys, exploring for oil, gas, and other minerals in the United States, and constructing technical equipment needed to conduct its own such business. After 1959, while National continued in this business, a substantial part of National’s business activities was in the field of manufacturing and assembling electronic equipment for others.
59. At all times here relevant, Messrs. Gillin, Mitchell, and Vaughan constituted National’s board of directors, and were officers of National. During part or all of the period from January 1, 1961, through December 31, 1963, 13 other persons actually served as officers of National; two such National officers were Namco officers; and four such National officers were McCollum officers. During the aforementioned period, Namco had five officers who were not National officers, and McCollum had three officers who were never National officers.
60. National did not perform any of the revenue-producing activities for or on behalf of Namco or McCollum. National did perform a portion of the clerical, administrative, manufacturing, and equipment maintenance activities for Namco and for McCollum. The compensation for such services was negotiated at arm’s length between Mr. McKay, who was not a shareholder in National, and the officers of National, some of whom were also shareholders of Namco and *728 McCollum. Among the services rendered were a portion of tHe acquisition and modification of some of Namco’s and McCollum’s equipment, tHe providing of some of the clerical services, such as the maintenance of certain ledgers, the preparation of certain financial statements, the payment of certain bills, the preparation of certain tax returns, etc., and the conduct of certain of the personnel services, including the placement of advertisements for employment and the interviewing and employment of some of the personnel. In terms of volume, both Namco at location in Libya and McCollum at location in Australia performed for themselves a greater volume of these services than did National in Dallas.
61. For activities which National performed in behalf of Namco and McCollum, National charged them generally on the same basis that National used in charging other clients for whom it provided additional services. For equipment, National charged Namco and McCollum the amount of National’s cost of equipment and parts plus 200 percent of National’s labor costs in connection with the acquisition, modification, and maintenance of equipment, this arrangement being comparable to certain research, development, and manufacturing contracts which National had with United States Government agencies during the period in question. For clerical and personnel services, National charged Namco and McCollum for the portion of the salary and wages paid plus 18 percent, this arrangement being comparable to the provisions of most of National’s contracts for domestic geophysical services with respect to extra personnel and extra time of personnel during the period in question.
62. (a) National and Namco had a common profit-sharing plan, to which both jointly contributed. This plan was ah ready in existence for employees of National when Namco adopted it for its employees on September 17, 1957, and Namco continued to make contributions until it was liquidated. Following McCollum’s incorporation in March 1961, it adopted this plan, and, in joint meetings of their respective boards of directors, the amounts to be contributed to the plan were concurrently resolved by each of the three companies. After Namco’s dissolution, National and McCollum contin *729 ued to contribute, at joint board meetings, to the National profit-sharing plan.
(b) The plan was a valuable asset to Namco, since it provided an inducement to high-technology personnel to wort for Namco rather than a competitor. The fund also had cash or securities, which would, in part, inure to the future benefit of McCollum’s new employees, or the officers retained by McCollum, since the portion contributed by Namco was not distributed to the discharged employees.
63. Prior to the time Namco was dissolved, it owned a $500,000 key-man life insurance policy on the life of Mr. Gril-lin. On July 27, 1962, McCollum and the Continental Geophysical Company, another company of which Mr. Gillin was an officer ¡and director, acquired this life insurance policy for a total consideration of $37,776.10, payable one-half by each. The boards of both McCollum and Continental subsequently approved the purchase.
64. (a) Namco’s business wholly terminated on December 17,1962, and was not carried on thereafter by McCollum.
(b) The dissolution of Namco resulted in the complete liquidation of that corporation.
CONCLUSION OE LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, together with interest as provided by law, and judgment is entered to that effect. The amounts of the recoveries will be determined in subsequent proceedings pursuant to Eule 131(c).
Tn accordance with the opinion of the court, stipulations of the parties, and memorandum reports of the commissioner, it was ordered on December 22, 1971 that judgments for the plaintiffs be entered ¡as follows:
Walter E. and Nell Mitchell, No. 19-69_$18, 558.15
Philip and Audrey G. Eeed, No. 23-69_ 53,479. 59
John A. Gillin, No. 24-69- 190,319. 95
Alexander E. and Lorene E. McKay, No. 25-69_ 32,781. 63